UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTATE OF DANIEL L.
WASILCHEN, et al.,

                Plaintiffs,

       v.

HENRY F. GOHRMAN, et al.,

                Defendants.

CASE NO. C11-0749JLR

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

On May 29, 2009, Daniel Wasilchen was shot and killed by law enforcement officers outside of his home in Snohomish County, Washington. Mr. Wasilchen's estate ("the Estate"), his sister Kimberly A. Tubbs, and his mother Virginia B. Vukasin[1] filed the instant lawsuit against Snohomish County ("the County") and Henry "Sonny"

---

[1] Ms. Tubbs and Ms. Vukasin are proceeding individually and in their capacities as the co-personal representatives of the Estate. (*See* Compl. (Dkt. # 1) at 4.)

ORDER- 1

1    Gohrman, the County's Noxious Weed Coordinator.[2]  Plaintiffs allege the following

2    causes of action against Defendants:  (1) violation of Mr. Wasilchen's Fourth

3    Amendment rights; (2) violation of Mr. Wasilchen's Fourteenth Amendment rights; (3)

4    violation of Ms. Vukasin's Fourteenth Amendment rights; (4) violation of the

5    Washington State Noxious Weed Statute, RCW Chapter 17.10; (5) negligence; (6)

6    negligent training and supervision against the County; (7) wrongful death; (8) intentional

7    torts, including but not limited to trespass, outrage, assault, battery, and false arrest; (9)

8    civil conspiracy; and (10) violation of Plaintiffs' rights under the Washington State

9    Constitution.  (Compl. (Dkt. # 1) ¶¶ 3.1-3.17.)  Plaintiffs also seek punitive damages.  (*Id.*

10    ¶ 4.1.)

11        Currently before the court is Plaintiffs' motion for partial summary judgment (Dkt.

12    # 24) and Defendants' motion for summary judgment (Dkt. # 14).  In response to

13    Defendants' motion, Plaintiffs withdrew their state law claims for civil conspiracy,

14    assault and battery, trespass, negligent training and supervision, outrage, and false arrest.

15    (Resp. to Def. Mot. (Dkt. # 38) at 24-25.)  Additionally, Plaintiffs' counsel conceded

16    during oral argument that Plaintiffs' claims under the Washington State Constitution

17    should be dismissed because there is no private cause of action for damages for the

18    alleged violations of the Washington State Constitution.  *See, e.g.*, *Reid v. Pierce Cnty.*,

19

20 _____

21      [2] The complaint also names Mr. Gohrman's wife, Jane Doe Gohrman, and Snohomish
County Deputy Sheriff Gregory Rasar.  (*See* Compl. at 4.)  On February 6, 2012, the court

22    entered an order, pursuant to the parties' stipulation, dismissing Deputy Rasar from this lawsuit
without prejudice (Dkt. # 13).

1   961 P.2d 333, 342-43 (Wash. 1988); *Blinka v. Wash. State Bar Ass'n*, 36 P.3d 1094, 1102

2   (Wash. Ct. App. 2001).

3       The remaining claims to be discussed in this order are Plaintiffs' federal

4   constitutional claims, the alleged violation of the Noxious Weed Statute, negligence, and

5   wrongful death.  Having considered the submissions of the parties, the balance of the

6   record, and the relevant law, and having heard the oral argument of counsel on April 23,

7   2012, the court DENIES Plaintiffs' motion (Dkt. # 24), and GRANTS Defendants'

8   motion (Dkt. # 14).[3]

9           **II.     BACKGROUND**

10   **A. Washington State's Noxious Weed Statute**

11       In 1969, the Washington State Legislature enacted the Noxious Weed Statute to

12   protect Washington State's agricultural and other resources from the economic loss and

13   adverse effects caused by noxious weeds.  RCW 17.10.007.  Noxious weeds are plants

14   that, when established, are highly destructive, competitive, or difficult to control.  RCW

15   17.10.010(1).  The Washington State Noxious Weed Board adopts a state weed list each

16   year, in accordance with the Noxious Weed Statute.  RCW 17.10.080; *see also* 1st

17   Gohrman Decl. (Dkt. # 15) ¶ 5.  Noxious weeds on the weed list are separated into three

18   classes—A, B, or C—based on distribution, abundance, and level of threat (i.e. how

19

20       [3] Defendants have also moved to strike portions of Marvin Verlinde's declaration (Dkt. #

21   26) and Jay Scott's declaration (Dkt. # 37).  (*See* Resp. to Pl. Mot. (Dkt. # 27) at 24-25; Reply to Def. Mot. (Dkt. # 40) at 12.)  The court DENIES Defendants' motion to strike portions of Mr.

22   Verlinde's declaration, but GRANTS Defendants' motion to strike portions of Mr. Scott's declaration.

dangerous the plant is to humans, animals, private and public lands, and native habitats). RCW 17.10.010(2); *see also* 1st Gohrman Decl. ¶ 5. Class A weeds are the most limited in distribution and the highest priority for control. RCW 17.10.010(2); *see also* 1st Gohrman Decl. ¶ 5. Class B and C weeds vary in priority based on local distribution and impacts. RCW 17.10.010(2); *see also* 1st Gohrman Decl. ¶ 5. Property owners are required to eradicate all Class A weeds, control and prevent the spread of all Class B weeds designated for control in that region of the state, and control and prevent the spread of all Class B and C weeds listed on the county weed list. RCW 17.10.140; *see also* 1st Gohrman Decl. ¶ 5. "Eradicate" means to eliminate a noxious weed within an area of infestation, and "control" is defined as the prevention of all seed production and dispersal of all parts of the plant capable of forming new plants. WAC 16-750-003(2).

The Noxious Weed Statute creates a comprehensive scheme for regulating weed eradication and granting authority to county weed control boards to conduct searches of private property, issue citations and infractions, directly control the spread of noxious weeds, place liens on property, and otherwise exercise the power and authority created by the legislation. RCW 17.10.074(1)(g), 17.10.160-.180, 17.10.230, 17.10.280-.350. In particular, when a weed control board finds that a property owner is not taking prompt and sufficient action to control the noxious weeds on his or her property, the noxious weed coordinator, under the authority of the local noxious weed board, can institute a formal enforcement action against the owner. RCW 17.10.170. To do so, the noxious weed coordinator must send written notice by certified mail notifying the owner that he or she is in violation of the Noxious Weed Statute, identifying the weeds found on the

property, specifying the date by which the prescribed control action must be taken, and informing the owner that if he or she fails to take action, the county weed board may control the weeds at the owner's expense. *Id.*

The Noxious Weed Statute also authorizes agents and employees of the county noxious weed control board to enter private property under certain circumstances, and obtain a warrant when the owner refuses permission to inspect the property or perform eradication or control work. RCW 17.10.160. The statute states in relevant part:

> Any authorized agent or employee of the county noxious weed control board . . . where not otherwise proscribed by law may enter upon any property for the purpose of administering this chapter and any power exercisable pursuant thereto, including the taking of specimens of weeds, general inspection, and the performance of eradication or control work. Prior to carrying out the purpose for which the entry is made, the official making such entry or someone in his or her behalf, shall make a reasonable attempt to notify the owner of the property as to the purpose and need for the entry.
>
> (1) When there is probable cause to believe that there is property within this state not otherwise exempt from process or execution upon which noxious weeds are standing or growing and the owner refuses permission to inspect the property, a judge of the superior court or district court in the county in which the property is located may, upon the request of the county noxious weed control board or its agent, issue a warrant directed to the board or agent authorizing the taking of specimens of weeds or other materials, general inspection, and the performance of eradication or control work.
>
> . . .
>
> (3) Nothing in this section requires the application for and issuance of any warrant not otherwise required by law: PROVIDED, That civil liability for negligence shall lie in any case in which entry and any of the activities connected therewith are not undertaken with reasonable care.
>
> (4) Any person who improperly prevents or threatens to prevent entry upon land as authorized in this section or any person who interferes with the

carrying out of this chapter shall be upon conviction guilty of a misdemeanor.

RCW 17.10.160. In addition, the Noxious Weed Statute provides "[t]hat individual members or employees of a county noxious weed control board are personally immune from civil liability for damages arising from actions performed within the scope of their official duties or employment." RCW 17.10.134.

**B. Noxious Weed Control in Snohomish County**

Pursuant to the Noxious Weed Statute, RCW 17.10.060(1), the Snohomish County Noxious Weed Control Board ("the Weed Control Board") hired Mr. Gohrman as the County's Noxious Weed Coordinator in 1999 (1st Gohrman Decl. ¶ 2). Before assuming this position, Mr. Gohrman worked under the previous Noxious Weed Coordinator as a seasonal employee from 1996 through 1998. (*Id.* ¶ 3.)

As the Noxious Weed Coordinator, Mr. Gohrman is responsible for identifying locations where noxious weeds grow in the County and determining who owns the property; notifying property owners that noxious weeds are growing on their property and informing them of their responsibility to prevent proliferation of the weeds; helping identify the plant and educating property owners regarding how to control the specific noxious weed; if funding permits, assisting property owners in control of certain noxious weeds; maintaining and loaning out hand spray and other weed control equipment; and using and demonstrating the use of spraying and other weed control equipment in an environmentally conscious and responsible manner. (1st Gohrman Decl. ¶ 6.) Mr. Gohrman also has various administrative responsibilities, which include working with

one other full-time employee to oversee, train, and coordinate the work of seasonal

noxious weed control technicians.  (*Id.* ¶¶ 2, 7.)  In addition, Mr. Gohrman is responsible

for disseminating information regarding noxious weed eradication through the County's

website and the local newspaper, as well as writing reports for the Weed Control Board.

(*Id.* ¶ 8.)

       The vast majority of property owners in the County are cooperative with noxious

weed control on their property.  (*Id.* ¶ 13.)  Although there is a distinct minority of people

who do not like the County telling them that they need to control their noxious weeds,

most of these people eventually comply with Mr. Gohrman's and his staff's requests

without any problem.  (*Id.*)  Mr. Gohrman testified that during his approximately 12 years

as the County's Noxious Weed Coordinator, fewer than ten property owners stand out as

having been particularly difficult and uncooperative in controlling their noxious weeds,

and most of these persons eventually took the necessary steps to address their weed

issues.  (*Id.*)  In Mr. Gohrman's experience, property owners generally cooperate once he

or his staff is able to explain the purpose of the Noxious Weed Statute and the problems

caused by noxious weeds.  (*Id.*)  Furthermore, during Mr. Gohrman's tenure as the

Noxious Weed Coordinator, the approach of the Weed Control Board has been to back

away from uncooperative property owners rather than pursue the enforcement actions

that the Noxious Weed Statute authorizes.  (*Id.* ¶ 15.)  Mr. Gohrman has only sent a

certified enforcement letter on two occasions, and he has never pursued a warrant to

inspect or perform control actions on private property.  (*Id.*)

**C.  Knotweed in Snohomish County**

In 2009, when the events giving rise to this lawsuit occurred, knotweed was a Class B noxious weed.[4]  (*Id.* ¶ 18.)  Mr. Gohrman and his staff rarely engage in knotweed control work before the end of summer due to the particular biology of the weed.  (*Id.* ¶ 19; MacFarlane Decl. (Dkt. # 16) ¶ 7.)  During the spring and summer months, however, Mr. Gohrman and his staff work to identify locations of knotweed infestations and contact property owners regarding the presence of knotweed on their property.  (*Id.* ¶ 20; MacFarlane Decl. ¶ 7.)  When they are able to make contact with a property owner, they request written authorization to enter upon the property and engage in knotweed control work in late summer.  (1st Gohrman Decl. ¶ 20; MacFarlane Decl. ¶ 7.)  The property owner also has the option of spraying or otherwise controlling the knotweed him or herself.  (1st Gohrman Decl. ¶ 20.)

Approximately a week before May 29, 2009, Mr. Gohrman and David MacFarlane, a seasonal employee under Mr. Gohrman's supervision, were contacting property owners along the Mountain Loop Highway in rural, eastern Snohomish County. (*Id.* ¶¶ 16, 17; MacFarlane Decl. ¶ 8.)  Mr. Gohrman and Mr. MacFarlane were knocking on property owners' doors to inform them of the presence or possible presence of knotweed, and to either obtain their agreement to control the weeds themselves or ask them to sign a hold harmless agreement allowing the County to come back later and control the knotweed after it flowered.  (1st Gohrman Decl. ¶ 17; MacFarlane Decl. ¶ 8.)

---

[4] Knotweed is still classified as a Class B noxious weed.  (1st Gohrman Decl. ¶ 18.)

1      During this outing, Mr. Gohrman and Mr. MacFarlane contacted a property owner

2   next door to the house that they later learned belonged to Mr. Wasilchen.  (1st Gohrman

3   Decl. ¶ 21; MacFarlane Decl. ¶ 8.)  Both properties abutted Mountain Loop Highway.

4   (1st Gohrman Decl. ¶ 22; MacFarlane Decl. ¶ 10.)  While they were talking with the

5   neighbor, Mr. MacFarlane observed knotweed growing on Mr. Wasilchen's property.

6   (MacFarlane Decl. ¶ 8.)  Mr. Gohrman then knocked on Mr. Wasilchen's front door, and

7   when no one answered, he left his business card and a note asking that Mr. Wasilchen

8   call him regarding the knotweed, which was his regular practice when he visited

9   someone's house regarding a noxious weed and the owner was not home.  (1st Gohrman

10   Decl. ¶ 21; MacFarlane Decl. ¶ 9.)

**11   D.  Events of May 29, 2009**

12      On May 29, 2009, Mr. Gohrman and Mr. MacFarlane returned to Mr. Wasilchen's

13   property, driving the County's noxious weed control vehicle.  (1st Gohrman Decl. ¶ 23;

14   MacFarlane Decl. ¶ 11.)  Three men, later identified as Mr. Wasilchen, his step-father

15   Marvin Verlinde, and his uncle Frederick Williams, were standing outside of Mr.

16   Wasilchen's residence.  (Verlinde Decl. (Dkt. # 26) ¶ 3.)  Mr. MacFarlane, who was

17   driving, parked on the side of the highway across from Mr. Wasilchen's house.  (1st

18   Gohrman Decl. ¶ 23; MacFarlane Decl. ¶ 13.)  Mr. Gohrman got out of the vehicle with a

19   business card and a hold harmless agreement for the property owner to review.  (1st

20   Gohrman Decl. ¶ 23; MacFarlane Decl. ¶ 13.)  Mr. MacFarlane remained in the vehicle

21   with his window rolled down.  (MacFarlane Decl. ¶ 13.)  Mr. Gohrman then walked

22   across the highway toward the three men and introduced himself as Sonny Gohrman, the

ORDER- 9

1   Noxious Weed Coordinator.  (1st Gohrman Decl. ¶ 23; MacFarlane Decl. ¶ 13.)  The

2   witnesses tell somewhat different stories regarding what happened during the ensuing

3   conversation.

4          Mr. Gohrman testified that his conversation with the three men began with a little

5   bit of joking about whether there were noxious weeds on the property.  (1st Gohrman

6   Decl. ¶ 23.)  One man stated that there were no noxious weeds, and Mr. Gohrman insisted

7   that there were.  (*Id.*)  Mr. Gohrman hoped to explain the noxious weed program and

8   either obtain the property owner's permission to return near the end of summer to kill the

9   knotweed, or receive a commitment from the owner to control the weeds himself.  (*Id.*)

10  Mr. Gohrman therefore asked if the owner was present.  (*Id.*)  Mr. Gohrman testified that

11  one of the men—who he later learned was Mr. Wasilchen—stepped toward him and

12  became "totally belligerent."  (*Id.* ¶ 24.)  Mr. Gohrman further testified that Mr.

13  Wasilchen was "very angry for reasons I couldn't fathom."  (*Id.*)  According to Mr.

14  Gohrman, he tried to explain Mr. Wasilchen's obligations under the weed control laws,

15  but he does not think that Mr. Wasilchen heard him.  (*Id.*)  Mr. Gohrman testified that

16  Mr. Wasilchen yelled at Mr. Gohrman to "get the fuck off his property" and that he

17  would not have anything to do with the Weed Control Board.  (*Id.*; *see also* MacFarlane

18  Decl. ¶ 14.)  Accordingly to Mr. Gohrman, Mr. Wasilchen was "right in [Mr. Gohrman's]

19  face and used his body and/or his hands to shove [Mr. Gohrman] back toward the road."

20  (1st Gohrman Decl. ¶ 24; *see also* MacFarlane Decl. ¶ 14.)  Mr. Gohrman also testified

21  that the two other men were unsuccessfully trying to calm Mr. Wasilchen down.  (1st

22  Gohrman Decl. ¶ 24.)  Mr. Gohrman further testified that Mr. Wasilchen yelled that if he

did not leave or if he came back, Mr. Wasilchen would get a gun and shoot him.  (*Id.*; *see also* MacFarlane Decl. ¶ 14.)  According to Mr. Gohrman, as he went back across the street, he told Mr. Wasilchen that it was a misdemeanor to interfere with his work.  (1st Gohrman Decl. ¶ 24; *see also* MacFarlane Decl. ¶ 14.)

Mr. Verlinde recalled the events differently.  According to Mr. Verlinde, Mr. Wasilchen told Mr. Gohrman that he took care of his own weeds and politely asked Mr. Gohrman to leave several times.  (1st Dearie Decl. Ex. L (Dkt. # 25-2) (Verlinde Dep.) at 48-49, 59.)  Mr. Verlinde testified that Mr. Gohrman refused to leave and that Mr. Gohrman got in Mr. Wasilchen's face and yelled at him.  (*Id.* at 59.)  Mr. Verlinde testified further that Mr. Wasilchen then "put his hands on [Mr. Gohrman], backed him up on the road."  (*Id.*)  When Mr. Wasilchen removed Mr. Gohrman from the area in front of his house, Mr. Verlinde testified, Mr. Gohrman began screaming and yelling and told his partner to call the sheriff.  (*Id.* at 67.)  Mr. Verlinde described Mr. Gohrman as a "bulldog" who was "harass[ing]" Mr. Wasilchen.  (*Id.* at 66.)  By contrast, Mr. Verlinde testified that Mr. Wasilchen remained very calm throughout the encounter (*id.* at 72) and that he never heard Mr. Wasilchen threaten to use a gun (Held Decl. (Dkt. # 21) Ex. A (Vukasin Dep.) at 100).

Mr. Williams remembered the encounter slightly differently.  He testified that Mr. Gohrman and Mr. Wasilchen's interaction began cordially but that Mr. Wasilchen "kind of blew" when Mr. Gohrman reported that he had seen noxious weeds at the back of Mr. Wasilchen's property.  (1st Dearie Decl. Ex. X (Dkt. # 25-4) (Williams Dep.) at 31-32.)  At that point, according to Mr. Williams, Mr. Wasilchen asked Mr. Gohrman to leave,

1    and then Mr. Gohrman became "obnoxious" and "belligerent." (*Id.* at 32.) Mr. Williams

2    testified that when Mr. Gohrman refused to leave, Mr. Wasilchen put his hands on Mr.

3    Gohrman's shoulders and "slowly walked, pushing Gohrman backwards" towards the

4    highway. (Held Decl. Ex. B (Williams Dep.) at 60.) Mr. Williams testified that when

5    Mr. Gohrman reached the pavement, Mr. Wasilchen said, "Get the fuck off my property,

6    and don't you ever come back." (*Id.*) Mr. Williams further testified that Mr. Wasilchen

7    never mentioned a gun or threatened Mr. Gohrman. (*Id.* at 82.)

8         When Mr. Gohrman returned to his vehicle, he was upset and he told Mr.

9    MacFarlane that they needed to call the sheriff. (1st Gohrman Decl. ¶ 24; MacFarlane

10   Decl. ¶ 15.) There was no cell phone reception across the street from Mr. Wasilchen's

11   property, so they drove west on the highway to an area where they could get reception.

12   (1st Gohrman Decl. ¶ 25; MacFarlane Decl. ¶ 15.) At approximately 3:30 p.m., Mr.

13   Gohrman called 9-1-1. (1st Gohrman Decl. ¶ 25; MacFarlane Decl. ¶ 15; 1st Rasar Decl.

14   (Dkt. # 23) ¶ 11.) Mr. Gohrman identified himself as the County's Noxious Weed

15   Coordinator and reported that Mr. Wasilchen "got totally belligerent, threatened me, and

16   said he was going to go get his gun, shoved me, told me to get off his property." (1st

17   Dearie Decl. Ex. Q (Dkt. # 25-3) (Transcript from 9-1-1 Call) at 3.) Mr. Gohrman also

18   stated that "essentially it's a misdemeanor if they don't let us do an inspection once

19   we've contacted them." (*Id.*)

20        At approximately 3:40 p.m., two Deputy Sheriffs, Gregory Rasar and Timothy

21   King, met Mr. Gohrman and Mr. MacFarlane on the side of the highway where Mr.

22   Gohrman placed the 9-1-1 call. (1st Gohrman Decl. ¶ 25; MacFarlane Decl. ¶ 17; 1st

ORDER- 12

1   Rasar Decl. ¶ 12; King Decl. (Dkt. # 17) ¶ 9.)  The deputies were in uniform and were

2   driving a fully marked patrol vehicle with an overhead light bar.  (MacFarlane Decl. ¶ 17;

3   1st Rasar Decl. ¶ 10; King Decl. ¶7.)  The four men stood on the shoulder of the highway

4   as Mr. Gohrman explained why they had gone to the property, recounted his belief that

5   he had the right to be there to explain the owner's obligations to control noxious weeds,

6   and described Mr. Wasilchen's threat to shoot him and being shoved as Mr. Wasilchen

7   got in his face.  (1st Gohrman Decl. ¶ 25; 1st Rasar Decl. ¶¶ 12-13; King Decl. ¶¶ 8-9.)

8        Because they did not know Mr. Wasilchen's address, Deputy Rasar asked if Mr.

9   Gohrman would take them to Mr. Wasilchen's property, and Mr. Gohrman agreed.  (1st

10  Gohrman Decl. ¶ 25; MacFarlane Decl. ¶ 17; 1st Rasar Decl. ¶ 14; King Decl. ¶ 10.)

11  Deputy Rasar testified that he intended to make contact with Mr. Wasilchen and discuss

12  what happened, to investigate the reported threat and assault, and to see if he could

13  resolve the apparent conflict so that Mr. Wasilchen and Mr. Gohrman could have a

14  productive conversation.  (1st Rasar Decl. ¶¶ 14-15; *see also* King Decl. ¶ 10.)

15       Similarly, Mr. Gohrman testified that he understood that the deputies were going

16  to attempt to contact Mr. Wasilchen to hear his side of the story regarding the alleged

17  threat and the shove, and see if they could calm the situation and perhaps provide an

18  opportunity for Mr. Gohrman to discuss knotweed control with Mr. Wasilchen.  (1st

19  Gohrman Decl. ¶ 25.)  Mr. Gohrman testified that he understood that upon arrival, he and

20  Mr. MacFarlane would stay in their vehicle and wait for further instructions from Deputy

21  Rasar, and that he would only speak with Mr. Wasilchen if Mr. Wasilchen agreed after

22  discussing the matter with Deputy Rasar.  (*Id.*; *see also* MacFarlane Decl. ¶ 17; 1st Rasar

1   Decl. ¶¶ 14-15.)  Mr. Gohrman also testified that he did not plan to enter Mr. Wasilchen's

2   property to conduct an inspection or to engage in any knotweed control or eradication

3   work; he only wanted to speak with Mr. Wasilchen.  (*Id.* ¶ 27; *see also* MacFarlane Decl.

4   ¶ 12.)

5         Mr. MacFarlane, driving the weed control vehicle, led the caravan back to Mr.

6   Wasilchen's property.  (*Id.* ¶ 28; MacFarlane Decl. ¶ 17.)  Deputy Rasar had instructed

7   Mr. MacFarlane and Mr. Gohrman to pull over short of and away from Mr. Wasilchen's

8   residence.  (1st Rasar Decl. ¶ 15.)  According to Mr. Gohrman, Mr. MacFarlane pulled

9   over onto the gravel shoulder of the highway west of Mr. Wasilchen's residence.  (1st

10  Gohrman Decl. ¶ 28; *see also* 1st Rasar Decl. ¶ 16.)  Mr. MacFarlane described the area

11  in which they pulled over as "what seemed to be . . . Mr. Wasilchen's gravel and dirt

12  driveway where it crossed the shoulder of the roadway."  (MacFarlane Decl. ¶ 17.)  Mr.

13  MacFarlane also testified that they pulled over "close to the same spot" where the initial

14  altercation occurred.[5]  (1st Dearie Decl. Ex. M (Dkt. # 25-2) (MacFarlane Dep.) at 32.)

15        The deputies pulled over and parked behind them.  (1st Gohrman Decl. ¶ 28;

16  MacFarlane Decl. ¶ 17; 1st Rasar Decl. ¶ 16; King Decl. ¶ 11.)  It was almost 3:50 p.m.

17  when they arrived.  (1st Rasar Decl. ¶ 16.)  Mr. Wasilchen was in front of his house, and

18  he turned and retreated in the shadows as they pulled up.  (1st Gohrman Decl. ¶ 28;

19  MacFarlane Decl. ¶ 18; 1st Rasar Decl. ¶ 17; King Decl. ¶ 12.)  As he did, Deputy Rasar

20

21        [5] Defendants have submitted undisputed evidence that the property on which the initial
22  altercation occurred and on which Mr. MacFarlane later parked the weed control vehicle
    belonged to the County in fee.  (*See generally* Torrence Rule 26 Report (Dkt. # 19).)

1  called, "Sheriff's office, just come back out and talk to us."  (1st Rasar Decl. ¶ 17; *see*

2  *also* 1st Gohrman Decl. ¶ 28; King Decl. ¶ 12.)

3      A few seconds later, Mr. Wasilchen returned carrying a gun.  (1st Gohrman Decl.

4  ¶ 28; MacFarlane Decl. ¶ 18; 1st Rasar Decl. ¶ 17; King Decl. ¶ 13.)  He yelled

5  something similar to, "Get the hell off my property!"  (1st Rasar Decl. ¶ 17; *see also*

6  King Decl. ¶ 13.)  Deputy King shouted, "He has a gun!"  (1st Rasar Decl. ¶ 17; King

7  Decl. ¶ 13.)  Mr. Wasilchen moved toward the noxious weed control vehicle and aimed

8  his gun at either Deputy King or Mr. Gohrman.  (1st Gohrman Decl. ¶ 28; MacFarlane

9  Decl. ¶ 18; 1st Rasar Decl. ¶ 17; King Decl. ¶ 13.)  Deputy Rasar drew his firearm in his

10  left hand but could not get a clear line on Mr. Wasilchen because he was standing at the

11  left rear corner of the weed control vehicle, and Mr. Wasilchen was standing at the front

12  right corner of the vehicle.  (1st Rasar Decl. ¶ 18.)  Deputy King shouted, "Sheriff's

13  Office!  Drop the gun!"  (1st Rasar Decl. ¶ 18; King Decl. ¶ 13; *see also* MacFarlane

14  Decl. ¶ 20.)  Mr. Wasilchen answered, "You drop yours!"  (1st Rasar Decl. ¶ 18; King

15  Decl. ¶ 14.)  Deputy Rasar then yelled, "Sheriff's Office!  Drop the gun!" several times.

16  (1st Rasar Decl. ¶ 18.)  At some point during this verbal exchange, Deputy King took

17  cover behind the right rear of the weed control vehicle, and Deputy Rasar joined him.

18  (*Id.*; King Decl. ¶ 15.)

19      Mr. Wasilchen moved to the front of the weed control vehicle and trained his

20  weapon on Mr. Gohrman and Mr. MacFarlane.  (1st Gohrman Decl. ¶ 28; MacFarlane

21  Decl. ¶ 19.)  Mr. Gohrman thought that Mr. Wasilchen was going to shoot him right then,

22  so he ducked behind the dashboard.  (1st Gohrman Decl. ¶ 28.)  When Mr. Gohrman

1   ducked down, Mr. Wasilchen trained his gun on Mr. MacFarlane, who was seat-belted in

2   and stuck behind the steering wheel.  (MacFarlane Decl. ¶ 19.)  Mr. Gohrman then asked

3   Mr. Wasilchen if they could leave, and Mr. Wasilchen said that they could not.  (1st

4   Gohrman Decl. ¶ 28; MacFarlane Decl. ¶ 20.)  According to Mr. Gohrman and Mr.

5   MacFarlane, Mr. Wasilchen indicated that they could get out of the vehicle, and they

6   exited the vehicle and ran as fast as they could to the back of the deputies' vehicle.  (1st

7   Gohrman Decl. ¶ 28; MacFarlane Decl. ¶ 20.)  The deputies, however, recall that Mr.

8   Gohrman and Mr. MacFarlane remained in their vehicle throughout the encounter.  (1st

9   Rasar Decl. ¶¶ 18-22; King Decl. ¶ 17.)

10          At this point, the deputies had taken cover behind the noxious weed control

11  vehicle.  (1st Gohrman Decl. ¶ 29; MacFarlane Decl. ¶ 21.)  Mr. Wasilchen had trained

12  his gun on the deputies, who ducked and bobbed behind the vehicle to stay clear of Mr.

13  Wasilchen's line of fire.  (1st Rasar Decl. ¶ 19; King Decl. ¶¶ 14-15.)  Deputy Rasar

14  shouted to Mr. Wasilchen, "Drop the gun," "We don't need to do this," and "Nobody

15  needs to get hurt."  (1st Rasar Decl. ¶ 19; *see also* King Decl. ¶ 15; MacFarlane Decl. ¶

16  21.)  Mr. Wasilchen did not acknowledge or respond to Deputy Rasar's commands.  (1st

17  Rasar Decl. ¶ 19; King Decl. ¶ 15.)  Deputy King tried to see if he had a clear shot at Mr.

18  Wasilchen's legs under the vehicle, but the vehicle's front tires blocked any shot.  (1st

19  Rasar Decl. ¶ 20; King Decl. ¶ 16.)  Deputy Rasar was in fear that Mr. Wasilchen was

20  going to shoot and possibly kill one or more of those present.  (1st Rasar Decl. ¶ 20.)

21  Because Deputy Rasar knew that he was going to have to shoot, he transferred his gun to

22  his right hand, his weaker hand, so that he would have to expose as little of his body as

1   possible.  (1st Rasar Decl. ¶ 20.)  Deputy Rasar then fired three shots, killing Mr.

2   Wasilchen.  (1st Rasar Decl. ¶ 20, 22; King Decl. ¶¶ 16, 18, 20; 1st Gohrman Decl. ¶ 29;

3   MacFarlane Decl. ¶ 21.)

4         After the shooting, the police took statements from and interviewed Mr. Gohrman

5   and Mr. MacFarlane.  (1st Gohrman Decl. ¶¶ 30, 31; MacFarlane Decl. ¶ 22.)  During his

6   interview, Mr. Gohrman indicated that the time between when they pulled up at Mr.

7   Wasilchen's property and when the deputies shot him was probably no more than two or

8   three minutes.  (1st Gohrman Decl. Ex. B (Gohrman Interview) at 10.)

9   **E. Procedural History**

10        On April 4, 2011, Plaintiffs filed the instant lawsuit in the Washington State

11  Superior Court for Skagit County.  (Compl. at 4.)  Defendants timely removed the action

12  to this court.  (Not. of Removal (Dkt. # 1).)  On February 21, 2012, the parties filed the

13  cross-motions for summary judgment that are currently pending before the court.  (Pl.

14  Mot. (Dkt. # 24); Def. Mot. (Dkt. # 14).)  The court heard oral argument on April 23,

15  2012, and this order follows.

16                  **III.   ANALYSIS**

17  **A. Summary Judgment Standard**

18        Summary judgment is appropriate if the evidence, when viewed in the light most

19  favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

20  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

21  P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

22  477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

1  there is no genuine issue of material fact and that he or she is entitled to prevail as a

2  matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden,

3  then the non-moving party "must make a showing sufficient to establish a genuine

4  dispute of material fact regarding the existence of the essential elements of his case that

5  he must prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.

6  Here, cross-motions for summary judgment are at issue.  The court "evaluate[s] each

7  motion separately, giving the nonmoving party in each instance the benefit of all

8  reasonable inferences."  *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th

9  Cir. 2006) (citations omitted); *see also Friends of Columbia Gorge, Inc. v. Schafer*, 624

10  F. Supp. 2d 1253, 1263 (D. Or. 2008).

11  **B.  Plaintiffs' Motion for Partial Summary Judgment**

12         Plaintiffs move for partial summary on their 42 U.S.C. § 1983 claim that Mr.

13  Gohrman violated Mr. Wasilchen's Fourth Amendment rights when he returned to Mr.

14  Wasilchen's home with the deputies after being ordered off the property by Mr.

15  Wasilchen.  (Pl. Mot. at 1.)  Section 1983 "provides a remedy to individuals whose

16  constitutional rights have been violated by persons acting under color of state law."

17  *Burke v. Cnty. of Alameda*, 586 F.3d 725, 731 (9th Cir. 2009) (quoting *Caballero v. City*

18  *of Concord*, 956 F.2d 204, 206 (9th Cir. 1992)). To sustain an action under § 1983, a

19  plaintiff must prove:  (1) that a defendant acted under color of state law; and (2) the

20  conduct deprived the plaintiff of a right secured by the Constitution or laws of the United

21  States.  *See Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir. 1997).  There is no

22  dispute that Mr. Gohrman acted under color of state law.  Consequently, the court need

1   only determine whether summary judgment is proper on Plaintiffs' claim that Mr.

2   Gohrman violated Mr. Wasilchen's Fourth Amendment rights.

3         The Fourth Amendment protects "[t]he right of the people to be secure in their

4   persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

5   Const. amend. IV.  An individual has a right to challenge a search when that individual

6   has a legitimate expectation of privacy in the area searched.  *United States v. $40,955.00*

7   *in U.S. Currency*, 554 F.3d 752, 756 (9th Cir. 2009) (citing *Rakas v. Illinois*, 439 U.S.

8   128, 140 (1978)); *see also Minnesota v. Carter*, 525 U.S. 83, 88 (1998).  The legitimate

9   expectation of privacy inquiry has both a subjective and an objective component.  *Oliver*

10  *v. United States*, 466 U.S. 170, 177 (1984) (citing *Katz v. United States,* 389 U.S. 347,

11  361 (1967)); *Smith v. Maryland*, 442 U.S. 735, 740–41 (1979); *United States v. Monghur*,

12  588 F.3d 975, 981 (9th Cir. 2009).  With respect to the subjective element, the question is

13  whether, through his or her conduct, the individual "exhibited an actual (subjective)

14  expectation of privacy."  *Smith*, 442 U.S. at 740 (quoting *Katz*, 389 U.S. at 361).  As for

15  the objective element, the issue is whether the subjective expectation of privacy is "one

16  that society is prepared to recognize as 'reasonable.'"  *Id.* at 740-41 (quoting *Katz*, 389

17  U.S. at 353).

18         Here, there is no dispute that Mr. Wasilchen ordered Mr. Gohrman to leave the

19  area in front of his home, thereby exhibiting his subjective expectation of privacy.  The

20  central question, therefore, is whether Mr. Wasilchen's subjective expectation of privacy

21  was objectively reasonable.  *See Smith*, 442 U.S. at 740-41.  Courts have held that

22  individuals are entitled to a legitimate expectation of privacy inside their homes.  *See,*

1   *e.g.*, *Oliver*, 466 U.S. at 178; *L.A. Police Protective League v. Gates*, 907 F.2d 879, 884

2   (9th Cir. 1990) ("[T]he protective force of the fourth amendment [is no] more powerful

3   than it is when the sanctity of the home is involved.").  This expectation of privacy

4   extends to the "curtilage" around one's home.  *United States v. Johnson*, 256 F.3d 895,

5   901 (9th Cir. 2001) (per curiam).  Under the "open fields" doctrine, area beyond the

6   curtilage is not protected by the Fourth Amendment.  *See Oliver*, 466 U.S. at 173.

7           Curtilage is "the land immediately surrounding and associated with the home."

8   *Oliver*, 466 U.S. at 180.  At common law, curtilage consisted of "the area to which

9   extends the intimate activity associated with the sanctity of a man's home and the

10  privacies of life." *Id.* (internal quotation and citation omitted).  Courts have since defined

11  curtilage by reference to factors that "determine whether an individual reasonably may

12  expect that an area immediately adjacent to the home will remain private." *Id.*  In *United*

13  *States v. Dunn*, 480 U.S. 294 (1987), the Supreme Court established four factors to

14  consider in resolving questions of curtilage:  (1) the proximity of the area claimed to be

15  curtilage to the home; (2) whether the area is included in an enclosure surrounding the

16  home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the

17  resident to protect the area from observation by people passing by.  *Id.* at 301; *see also*

18  *Johnson*, 256 F.3d at 901.  "The Court stressed that these factors cannot be 'mechanically

19  applied,' but are merely 'useful analytical tools' to determine whether an area is to be

20  protected from unconstitutional searches and seizures." *Johnson*, 256 F.3d at 901

21  (quoting *Dunn*, 480 U.S. at 301).

22

1   The standard for determining, in a civil action brought pursuant to § 1983, whether

2 an area is curtilage, is uncertain.  *See Dunham v. Kootenai Cnty.*, 690 F. Supp. 2d 1162,

3 1171 (D. Idaho 2010).  "In the context of a motion to suppress evidence in a criminal

4 case, it appears that most, if not all circuit courts have determined that curtilage questions

5 are factual determinations which must be made by the trial judge."[6]  *Id.* (collecting

6 cases).  Indeed, the Ninth Circuit has explained in the criminal context that it is vital that

7 the district court make findings of fact on curtilage.  *Johnson*, 256 F.3d at 901.

8   The Ninth Circuit has yet to address in the civil context whether the fact-intensive

9 question of curtilage should be resolved by the judge or whether it must be left to the jury

10 when reasonable minds could differ.  *See also Dunham*, 690 F. Supp. 2d at 1171.

11 Although curtilage questions are fact-intensive, decisions from several circuits indicate

12 that the question should be decided by a judge in civil cases, at least where there are

13 sufficient facts in the record to make the determination.  *See Mack v. City of Abilene*, 461

14 F.3d 547, 553-54 (5th Cir. 2006) (per curiam) (relying on the district court's findings of

15 fact to hold that the plaintiff's car was not within the curtilage of his apartment when it

16 was searched); *Bleavins v. Bartels*, 422 F.3d 445, 449 n.4 (7th Cir. 2005) (reviewing the

17 district court's decision on the issue of curtilage *de novo* after previously having

18 remanded the case to the district court to make such a decision); *Daughenbaugh v. City of*

19 *Tiffin*, 150 F.3d 594, 596-97 (6th Cir. 1998) (applying *de novo* review and viewing the

20

21   [6] Nevertheless, in the criminal context, the circuit courts are split on the appropriate

22 standard of review for curtilage determinations.  *See Bleavins v. Bartels*, 422 F.3d 445, 449 n.4
(7th Cir. 2005).

1   facts in the plaintiff's favor, court reversed district court's finding on summary judgment

2   that unattached and remote garage was not part of the home's curtilage, and found instead

3   that garage was part of home's curtilage); *cf. Knott v. Sullivan*, 418 F.3d 561, 573 (6th

4   Cir. 2006) (holding that material issues of fact regarding whether area was curtilage

5   precluded summary judgment because the record contained "scant" information

6   regarding the physical layout of the property); *Houghton v. Culver*, 452 F. Supp. 2d 212,

7   216 (W.D.N.Y. 2006) (same).[7] Here, there is no disputed issue of material fact regarding

8   where the weed control vehicle parked, and the record is replete with photographs and

9   diagrams of the area, as well as testimony from witnesses.  Accordingly, there is a

10  sufficient factual basis upon which to apply the *Dunn* factors.

11      **1.  First *Dunn* Factor:  Proximity**

12      With respect to proximity, generally, there is no fixed distance to which curtilage

13  extends.  *Johnson*, 256 F.3d at 902.  "It must be determined on a case-by-case-basis."  *Id.*

14  _____

15      [7] Some courts have submitted the question of whether certain property is within the
16  curtilage to a jury, or found that the question raises issues of material fact that cannot be decided
    on summary judgment.  *See Reid v. Hamby*, 124 F.3d 217, 1997 WL 537909, at *3 (10th Cir.
    1997) (unpublished) (holding that district court properly instructed jury on issue of curtilage);
17  *Hart v. Myers*, 183 F. Supp. 2d 512, 522 (D. Conn. 2002) (denying summary judgment to
    defendants on issue of whether search and seizure occurred beyond the curtilage because
18  "reasonable jurors could conclude that the . . . area was curtilage"); *Reich v. Minnicus*, 886 F.
    Supp. 674, 678-79 (S.D. Ind. 1993) (holding that jury's determination that property surrounding
19  plaintiff's shop was not curtilage was supported by the evidence); *Williams v. Garrett*, 722 F.
    Supp. 254, 260 (W.D. Va. 1989) ("It appears to this court that there is a genuine dispute over
20  whether this area could reasonably be thought to have been outside the curtilage—a question of
    fact which is material, if not dispositive.").  The court concludes that the weight of the precedent,
21  namely, the opinions from three different circuit courts cited above, indicates that the court
    should make a legal finding regarding whether the property at issue here—the area where the
22  weed control vehicle parked when it returned to Mr. Wasilchen's residence—was part of the
    curtilage of Mr. Wasilchen's home.

1   (citing *Dunn*, 480 U.S. at 301).  The Ninth Circuit has noted that its sister circuits

2   consider the importance of whether the area in question is in a rural, urban, or suburban

3   setting.  *Id.*  The curtilage of rural homes may extend farther than the curtilage of urban

4   and suburban homes.  *Id.*

5           In this case, Mr. Wasilchen's property was located in rural Snohomish County.

6   (1st Gohrman Decl. ¶¶ 16, 17.)  Nevertheless, the court does not consider the rural

7   location to be particularly relevant here because Mr. Wasilchen's home was located less

8   than 40 feet from the Mountain Loop Highway and the area alleged to be curtilage was

9   mere feet from the highway.[8]  (*See, e.g.*, Torrence Rule 26 Report Ex. J.)  Based on

10  diagrams submitted to the court, Mr. MacFarlane parked the weed control vehicle

11  approximately 30 feet from Mr. Wasilchen's house.  (*See* Torrence Rule 26 Report Ex. J;

12  Reply to Pl. Mot. (Dkt. # 45) at 3.)  Although the short distance could arguably weigh in

13  favor of a finding that the weed control vehicle encroached on the curtilage, "proximity

14  to the home, standing by itself, does not *per se*, suffice to establish an area as within the

15  _____

16      [8] Here, there is no dispute that the area in question belongs to the County in fee, not Mr.
    Wasilchen. (*See generally* Torrence Rule 26 Report (Dkt. # 19).)  Defendants assert that

17  curtilage, by definition, cannot extend beyond the bounds of Mr. Wasilchen's private property.
    (Resp. to Pl. Mot. (Dkt. # 27) at 12-13.)  The Ninth Circuit has implicitly rejected this argument.

18  *See United States v. Basher*, 629 F.3d 1161, 1169 (9th Cir. 2011).  In *Basher*, the defendant
    argued that officers conducted a warrantless entry or search of his camp site, which was on

19  National Forest Service land.  *Id.*  The defendant had been staying in an undeveloped camping
    area, which was visible from the developed camping area where the officers had stayed the

20  previous night.  *Id.*  The court held that there was no expectation of privacy in the campsite, and
    that the area outside of the tent in these circumstances was not curtilage.  *Id.*  Because the Ninth

21  Circuit considered whether there was an expectation of privacy in the publicly owned area
    surrounding the defendant's tent in *Basher*—rather than simply dismissing the defendant's
    argument because the land was publicly owned—the court here finds it appropriate to consider

22  the same question with respect to the county-owned land on which Mr. MacFarlane parked when
    they returned to Mr. Wasilchen's home at Deputy Rasar's request.

ORDER- 23

1    curtilage." *Bleavins*, 422 F.3d at 451 (quoting *United States v. French*, 291 F.3d 945,

2    952 (7th Cir. 2002)).  The proximity must be considered in relation to the other factors.

3    *Id.*

4          **2.  Second *Dunn* Factor:  Enclosure**

5          The second factor considers whether the area is included within an enclosure

6    surrounding the home.  "[F]or most homes, the boundaries of the curtilage will be clearly

7    marked; and the conception defining curtilage—as the area around the home to which the

8    activity of home life extends—is a familiar one easily understood from our daily

9    experience."  *Johnson*, 256 F.3d at 902 (quoting *Dunn*, 480 U.S. at 302).  Fencing is an

10   important factor in determining curtilage.  *Id.* (citing *Dunn*, 480 U.S. at 301 n.4).

11   Similarly, in rural areas, "natural boundaries such as thick trees or shrubberies may also

12   indicate an area 'to which the activity of home life extends.'"  *Id.* (quoting *Dunn*, 480

13   U.S. at 302 (citation omitted)).

14         Here, the area where the weed control vehicle parked was not surrounded by

15   fences or natural boundaries.  There were shrubberies and trees several feet in front of the

16   vehicle, and several feet to the right of the vehicle, there was the end of a fence that ran

17   perpendicular to the vehicle.  (*See* Torrence Rule 26 Report Ex. J; 2nd Rasar Decl. (Dkt.

18   # 30) Exs. A-B.)  Nevertheless, the area at issue here was in full view of the highway, and

19   in fact, the left side of the vehicle remained on the asphalt comprising the shoulder of the

20   highway.  (Torrence Rule 26 Report Ex. J.)  This factor, therefore, supports a finding that

21   the weed control vehicle did not enter the curtilage of Mr. Wasilchen's home.

22

### 3.  Third *Dunn* Factor:  Use of Area

The court must next consider how Mr. Wasilchen used the area at issue and whether this use is intimately connected with the activities of the home.  Backyards, for example, often satisfy this requirement.  *Bleavins*, 422 F.3d at 452.  The Ninth Circuit has noted that other circuits have required officers to have "objective data" about the use of the area prior to entry.  *Johnson*, 256 F.3d at 903.  Under *Dunn*, "when determining the 'use' of an area, the officers cannot rely . . . exclusively on information they learn after the search begins."  *Id.*

In this case, the area where Mr. MacFarlane parked the weed control vehicle appears to be the entrance of Mr. Wasilchen's driveway.  This was Mr. MacFarlane's understanding when he parked the vehicle, and it is supported by photographs and diagrams submitted to the court.  (1st Dearie Decl. Ex. M (Dkt. # 25-2) (MacFarlane Dep.) at 69-74; *see also* 2d Rasar Decl. ¶¶ 3, 4, Exs. A, B.)  Based on the evidence provided to the court, the use of this area as a driveway would be plain to anyone who saw it.

Plaintiffs also have submitted the declaration of Mr. Wasilchen's stepfather, Mr. Verlinde, who testified that Mr. Wasilchen used his "front yard" to refurbish old-military jeeps, which was his main hobby.  (Verlinde Decl. (Dkt. # 26) ¶¶ 5-8, Ex. A.)  According to Mr. Verlinde, Mr. Wasilchen stored "old jeep parts, tools, and other personal effects" in his "front yard."  (*Id.* ¶ 6.)  Mr. Verlinde highlighted the area which he considered to be Mr. Wasilchen's front yard on a map that was attached to his declaration, and the highlighted area included part of the property on which the weed control vehicle parked.

1   (*Id.* Ex. A.)  Therefore, this is evidence that Mr. Wasilchen used the subject area for his

2   hobbies, although this information would not have been readily available to Mr.

3   MacFarlane when he parked the weed control vehicle.

4        The question then is whether the uses of the subject area—ingress and egress from

5   Mr. Wasilchen's home and performance of his hobbies—are intimately tied to private

6   home life.  "A driveway is only a semiprivate area," in which an individual's reasonable

7   expectation of privacy is limited depending on the actions taken by the property owner to

8   preserve the area as private.  *United States v. Magana*, 512 F.2d 1169, 1171 (9th Cir.

9   1975).  Here, the evidence shows that Mr. Wasilchen took no steps to prevent public

10  access to his driveway or preserve the area as private.  *See United States v. Pineda-*

11  *Moreno*, 591 F.3d 1212, 1215 (9th Cir. 2010) (holding that no reasonable expectation of

12  privacy existed where the property owner had not taken steps, such as erecting "No

13  Trespassing" signs or a gate, "to exclude passersby from his driveway"); *see also United*

14  *States v. Hatfield*, 333 F.3d 1189, 1194-95 (10th Cir. 2003) (finding that "any

15  observations made by [an officer] while standing on [defendant's] driveway do not

16  constitute a search under the Fourth Amendment" where the driveway was open to the

17  public).  Therefore, any hobbies performed in this area cannot be said to be private.  The

18  use of the area at issue weighs in favor of a finding that it was not part of the curtilage.

19      **4.  Fourth *Dunn* Factor:  Protection from Observation**

20       The fourth *Dunn* factor focuses on the steps taken by Mr. Wasilchen to prevent

21  observation of the area from passers-by.  *Johnson*, 256 F.3d at 903.  As the Supreme

22  Court has held, "[w]hat a person knowingly exposes to the public, even in his own home

or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351; *see also California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.").  As noted above, Mr. Wasilchen did not take any steps to visibly shield the area where Mr. MacFarlane parked from the public, and it was in full view of the highway.  (*See* 2d Rasar Decl. Exs. A-B.)  This factor, therefore, supports a finding that the weed control vehicle did not enter the curtilage of Mr. Wasilchen's home.

### 5.  Findings Regarding Curtilage

Under the facts of this case and based on the combination of the four *Dunn* factors, the court finds that the weed control vehicle did not park on an area recognized as curtilage.  The driveway "was not so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection." *Dunham*, 690 F. Supp. 2d at 1173 (citing *Johnson*, 256 F.3d at 904).  Importantly, although the area where the weed control vehicle parked was relatively close to Mr. Wasilchen's home, it was partially on the shoulder of and in full view of the highway.  Mr. Wasilchen had taken steps to protect the privacy of other areas surrounding his home, but this was not one of those areas.  Despite Mr. Wasilchen's subjective expectation of privacy in this area, the circumstances of this case demonstrate that this was not an expectation that "society is prepared to recognize as reasonable." *Smith*, 442 U.S. at 740-41.  Because Mr. Gohrman did not enter an area in which Mr. Wasilchen had a legitimate expectation of privacy, any "search" or "seizure" did not violate Mr. Wasilchen's Fourth Amendment rights as a

1   matter of law.  Accordingly, the court denies Plaintiffs' motion for partial summary

2   judgment.

**C. Defendants' Motion for Summary Judgment**

4        Defendants move for summary judgment on all of Plaintiffs' claims.  Defendants

5   assert that all federal claims against Mr. Gohrman are barred by the doctrine of qualified

6   immunity.  (Def. Mot. at 8-12.)  They also assert that there is no basis for Plaintiffs'

7   federal claims against the County under *Monell v. Department of Social Services of the*

8   *City of New York*, 436 U.S. 658 (1978).  (Def. Mot. at 12-14.)  With respect to Plaintiffs'

9   state law claims, Defendants assert that the public duty doctrine bars Plaintiffs'

10   negligence claims, which also are not supported by the evidence, and that there is neither

11   factual nor legal support from Plaintiffs' intentional tort claims.  (*Id.* at 15-22.)  The court

12   concludes that Defendants are entitled to summary judgment on all of Plaintiffs' claims,

13   and sets forth its reasoning with respect to each issue below.

**1.  Plaintiffs' Federal Claims Against Mr. Gohrman**

15        Plaintiffs have brought several claims under 42 U.S.C. § 1983 for violations of

16   their rights under the United States Constitution.  As discussed above with respect to

17   Plaintiffs' motion for summary judgment, to sustain an action under § 1983, a plaintiff

18   must prove: (1) that a defendant acted under color of state law; and (2) the conduct

19   deprived the plaintiff of a right secured by the Constitution or laws of the United States.

20   *See Johnson*, 113 F.3d at 1117.  Again, there is no dispute that Mr. Gohrman acted under

21   color of state law, and therefore the court need only address whether Plaintiffs were

22   deprived of rights secured by the Constitution.

ORDER- 28

Plaintiffs advance three claims against Mr. Gohrman under the United States Constitution:  (1) violation of Mr. Wasilchen's Fourth Amendment rights to be free from unreasonable search and seizure; (2) violation of Mr. Wasilchen's Fourteenth Amendment right to due process; and (3) violation of Ms. Vukasin's Fourteenth Amendment right to due process.  (Compl. ¶¶ 3.9-3.14.)  Defendants argue that Mr. Gohrman did not violate either Mr. Wasilchen's or Ms. Vukasin's constitutional rights and that even if he did, he is entitled to qualified immunity.  (Def. Mot. at 8-12.)

Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights about which a reasonable person would have known.  *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  In determining whether an official is entitled to qualified immunity, courts apply a two-step test:  First, the court must determine if, taking the facts in the light most favorable to the non-moving party, the officer violated one of the plaintiff's constitutional rights.  *Id.*  Second, if the answer to the first question is "yes," then the court must "determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question."  *Id.* (quoting *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009)); *see also Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010).

For the reasons described below, the court concludes that Defendants are entitled to summary judgment on all of Plaintiffs' federal claims against Mr. Gohrman because, viewing the evidence in Plaintiffs' favor, there was no violation of Mr. Wasilchen's

1    constitutional rights.  The court, therefore, does not reach the second step in the qualified

2    immunity analysis.

3                    **a.  Fourth Amendment Claim**

4             Defendants maintain that Plaintiffs' Fourth Amendment seizure claim must fail

5    because there is no allegation or evidence that Mr. Gohrman seized Mr. Wasilchen.  (Def.

6    Mot. at 8.)  Defendants also contend that there is no evidence that Mr. Gohrman

7    undertook any search of Mr. Wasilchen's property.  (*Id.* at 10.)  Plaintiffs respond that

8    Mr. Gohrman is liable under the Fourth Amendment for provoking the violent

9    confrontation that resulted in Deputy Rasar's use of deadly force against Mr. Wasilchen.

10   (Resp. to Def. Mot. (Dkt. # 38) at 14 (citing *Billington v. Smith*, 292 F.3d 1177 (9th Cir.

11   2002)).)  In the Ninth Circuit, "where an officer intentionally or recklessly provokes a

12   violent confrontation, if the provocation is an independent Fourth Amendment violation,

13   he may be held liable for his otherwise defensive use of deadly force."  *Billington*, 292

14   F.3d at 1189.

15            Therefore, on a motion for summary judgment, the first question that the court

16   must consider is whether a reasonable jury could find that "the provocation is an

17   independent Fourth Amendment violation."  *Id.*  Plaintiffs contend that Mr. Gohrman

18   independently violated Mr. Wasilchen's Fourth Amendment rights in the following ways:

19   (1) unlawfully entering Mr. Wasilchen's property after Mr. Wasilchen expressly ordered

20   him to leave; (2) unlawfully committing an investigatory stop by initially refusing to

21   leave Mr. Wasilchen's property and then returning a short while later with the deputies;

22   and (3) improperly setting the violent confrontation in motion by misrepresenting the

ORDER- 30

1  facts and the law to the 9-1-1 dispatcher and the deputies.  (Resp. to Def. Mot. at 11-14.)

2  For the reasons described below, viewing the evidence in Plaintiffs' favor, the court

3  concludes that there is no issue of material fact and that Defendants are entitled to a

4  summary judgment that Mr. Gohrman did not violate Mr. Wasilchen's Fourth

5  Amendment rights.

6  ### i.       Unlawful Entry

7          First, Plaintiffs argue that Mr. Gohrman violated Mr. Wasilchen's Fourth

8  Amendment rights when Mr. MacFarlane parked the weed control vehicle at the entrance

9  of Mr. Wasilchen's driveway.  (Resp. to Def. Mot. at 11.)  With respect to Plaintiffs'

10 motion for summary judgment discussed above, the court concluded that the area where

11 Mr. MacFarlane parked the weed control vehicle was not within the curtilage of Mr.

12 Wasilchen's home.  (*See supra* § III.B.)  Viewing the evidence in Plaintiffs' favor, as it

13 must in considering Defendants' motion for summary judgment, the court comes to the

14 same legal conclusion that the weed control vehicle did not enter the curtilage.

15 Therefore, the area does not fall under the protections of the Fourth Amendment, and no

16 reasonable jury could find that Mr. Gohrman violated Mr. Wasilchen's constitutional

17 rights in this way.

18 ### ii.      Investigatory Stop

19         Plaintiffs next assert that Mr. Gohrman "seized" Mr. Wasilchen within the

20 meaning of the Fourth Amendment when he (1) initially persisted in trying to talk to Mr.

21 Wasilchen and refused to leave the area in front of Mr. Wasilchen's house, and/or (2)

22

1    returned within the hour in the company of County deputies.  (Resp. to Def. Mot. at 12-

2    13.)

3        "A Fourth Amendment seizure occurs only when an officer intentionally applies

4    physical restraint of a suspect, or initiates a show of authority to which a reasonable

5    innocent person would feel compelled to submit, and to which the suspect does submit

6    for reasons that are solely related to the official show of authority."  *United States v.*

7    *Caseres*, 533 F.3d 1064, 1069 (9th Cir. 2008) (internal citation omitted) (citing

8    *California v. Hodari D.*, 499 U.S. 621, 624 (1991), and *Florida v. Bostick*, 501 U.S. 429,

9    436-37 (1991)).  For example, the court in *Caseres* applied these principles to determine

10   whether an officer made an unlawful investigatory stop when, without probable cause,

11   the officer confronted the defendant on his residential lawn, ordered him to stop, and

12   began to question him.  *Id.*  Although the government conceded that the officer initiated a

13   show of authority to which a reasonable person would feel compelled to submit, the court

14   held that no "detention" occurred because the defendant did not submit to the officer's

15   authority at that time.  *Id.*  Rather, the defendant continued to move toward his residence,

16   yelled an explicative at the officer, threatened the officer verbally and physically, and

17   then turned and ran away.  *Id.* at 1067.

18       In this case, even if the court were to assume that Mr. Gohrman made a showing

19   of authority, there is no evidence that Mr. Wasilchen submitted to any such showing.

20   With respect to Mr. Gohrman and Mr. Wasilchen's first encounter on May 29, 2009, the

21   evidence, when viewed in Plaintiffs' favor, establishes that Mr. Wasilchen repeatedly told

22   Mr. Gohrman to leave his property and that he physically removed Mr. Gohrman from

ORDER- 32

1    the area in front of his home.  Regarding their second encounter on May 29, 2009, the

2    undisputed evidence shows that when Mr. MacFarlane parked the weed control vehicle

3    outside of Mr. Wasilchen's home, Mr. Wasilchen momentarily left his front yard and

4    then returned with a gun.  In light of the similarity between these facts and those in

5    *Caseres*, no reasonable jury could conclude that Mr. Wasilchen submitted to any show of

6    authority on the part of Mr. Gohrman, as is required to establish a seizure under the

7    Fourth Amendment.

8                        **iii.    Deliberate Falsehoods**

9            Finally, Plaintiffs argue that Mr. Gohrman violated Mr. Wasilchen's Fourth

10   Amendment rights when he made misrepresentations in his reports to the 9-1-1 dispatcher

11   and the deputies, which resulted in the deputies accompanying him to Mr. Wasilchen's

12   home where the deadly confrontation ensued.  (Resp. to Def. Mot. at 13.)  In support of

13   this theory of liability, Plaintiffs rely on the well established proposition that "personal

14   participation is not necessary to establish liability for a constitutional violation."  *Kwai*

15   *Fun Wong v. United States*, 373 F.3d 952, 966 (9th Cir. 2004).  "The requisite causal

16   connection can be established . . . also by setting in motion a series of acts by others

17   which the actor knows or reasonably should know would cause others to inflict the

18   constitutional injury."  *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978); *see also*

19   *Kwai Fun Wong*, 373 F.3d at 966.  The "critical question" is whether it was reasonably

20   foreseeable that the actions of the defendant would lead to the rights violations alleged to

21   have occurred.  *Kwai Fun Wong*, 373 F.3d at 966 (citing *Gini v. Las Vegas Metro. Police*

22   *Dep't*, 40 F.3d 1041, 1044 (9th Cir. 1994) (holding that where the government official

1    did not directly cause a constitutional violation, the plaintiff must show that the violation

2    was reasonably foreseeable to him)).

3         Here, Plaintiffs maintain that in speaking with 9-1-1 dispatch and the deputies, Mr.

4    Gohrman exaggerated the level of force used by Mr. Wasilchen to characterize it as an

5    assault, minimized his own role in instigating the conflict, and represented that Mr.

6    Wasilchen had committed a misdemeanor under the Noxious Weed Statute.  (Resp. to

7    Def. Mot. at 13.)  According to Plaintiffs, a reasonable jury could find that Mr. Gohrman

8    made deliberate misrepresentations with the intent of convincing the deputies to

9    accompany him back to Mr. Wasilchen's property, and that he should have known that

10   there was the potential for a violent conflict if he returned with two armed officers after

11   Mr. Wasilchen threatened to shoot him.  (*Id.* at 14.)

12        The court, however, need not reach the issues of whether Mr. Gohrman acted

13   improperly or whether the violent confrontation was reasonably foreseeable.  The fatal

14   deficiency with Plaintiffs' argument is that it neglects to establish any direct violation of

15   Mr. Wasilchen's constitutional rights; indeed, if Mr. Gohrman indirectly violated Mr.

16   Wasilchen's rights under the standard set forth in *Duffy*, as Plaintiffs allege, then

17   someone else must have directly caused a constitutional violation.[9]  *See Duffy*, 588 F.2d

18   at 743-44.  Plaintiffs, however, make no argument that anyone besides Mr. Gohrman

19   violated Mr. Wasilchen's constitutional rights, nor does the record support such an

20

_____

21        [9] By contrast, *Billington* does not require that the violent confrontation amount to a
     constitutional violation, so long as there is an underlying constitutional violation.  *See Billington*,
22   292 F.3d at 1189.

ORDER- 34

1   inference.  Although Deputy Rasar, who shot Mr. Wasilchen, was originally a party to

2   this lawsuit, Plaintiffs voluntarily dismissed him.  (*See* Dkt. ## 12, 13.)  The undisputed

3   facts, moreover, do not give rise to an inference that Deputy Rasar violated Mr.

4   Wasilchen's constitutional rights by using lethal force because he was responding to the

5   significant and immediate threat posed by Mr. Wasilchen, who refused to put down the

6   gun that he had leveled at the deputies and others.  *See, e.g.*, *Wilkinson v. Torres*, 610

7   F.3d 546, 551 (9th Cir. 2010) (finding no constitutional violation when officer used

8   deadly force in response to a significant and immediate threat to the safety of the officer

9   and others).

10          Based on the record before it, the court concludes that Plaintiffs' have failed to

11  raise a question of material fact regarding whether Mr. Gohrman is indirectly liable for

12  another person's violation of Mr. Wasilchen's constitutional rights.  As such, they cannot

13  prove that Mr. Gohrman's alleged misrepresentations constituted an independent

14  constitutional violation for purposes of liability under *Billington*.  In sum, because

15  Plaintiffs have failed to establish a jury question regarding any underlying constitutional

16  violation, as required under *Billington*, Defendants, are entitled to summary judgment on

17  Plaintiffs' Fourth Amendment claim.

18                  **b.  Fourteenth Amendment Claim on Behalf of Mr. Wasilchen**

19          Defendants move for summary judgment on Plaintiffs' Fourteenth Amendment

20  claim on behalf of Mr. Wasilchen, arguing that the Fourth Amendment, and not the

21  Fourteenth Amendment, governs analysis of the constitutional claims.  (Def. Mot. at 8.)

22  Plaintiffs maintain, however, that Mr. Wasilchen suffered violations of his Fourteenth

Amendment due process rights under a "danger creation" theory.  (Resp. to Def. Mot. at 14-17.)  Assuming without deciding that Plaintiffs' claim is properly considered under the Fourteenth Amendment, the facts of this case do not give rise to "danger creation" liability.

"It is well established that the Constitution protects a citizen's liberty interest in [his or] her own bodily security."  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing *Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977), and *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir. 1989)).  Similarly, as the Ninth Circuit has explained:

> It is also well established that, although the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action "affirmatively place[s] the plaintiff in a position of danger," that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced.

*Id.* (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197, 201 (1989)).  "Danger creation" liability exists where:  (1) there is "affirmative conduct on the part of the state in placing the plaintiff in danger," *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1069 (9th Cir. 2000) (internal quotation omitted); (2) the state acts with "deliberate indifference" to a "known or obvious danger," *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996); and (3) the injury is caused by "a third party not liable under § 1983," *Kennedy*, 439 F.3d at 1062 n.2; *see also Mitchell v. City of Pittsburg*, No. C 09-00794 SI, 2010 WL 2867237, at *3 (N.D. Cal. Jul. 19, 2010) ("Ninth Circuit case law makes clear that the doctrine is intended to apply only where the plaintiff has been

1   injured by the act of a third party or some other intervening cause, not where the plaintiff

2   is injured directly by a state actor.") (collecting cases).

3          In this matter, Mr. Wasilchen was not injured by a private third party or some

4   other intervening cause, as required for liability under a "danger creation" theory.

5   Rather, he was shot and killed by Deputy Rasar, a state actor.  In light of this undisputed

6   fact, the court need not consider whether Mr. Gohrman's affirmative conduct placed Mr.

7   Gohrman in danger or whether Mr. Gorman acted with deliberate indifference to a known

8   or obvious danger.  *See Mitchell*, 2010 WL 2867237, at *3 (dismissing Fourteenth

9   Amendment claim without leave to amend where decedent was injured by state actor).

10  Because Plaintiffs cannot sustain a Fourteenth Amendment claim on behalf of Mr.

11  Wasilchen, and the court grants summary judgment to Defendants on this issue.

12                    **c.  Fourteenth Amendment Claim on Behalf of Ms. Vukasin**

13         Defendants next move for summary judgment on Ms. Vukasin's Fourteenth

14  Amendment claim, arguing that such a claim cannot be sustained because neither Deputy

15  Rasar nor Mr. Gohrman violated Mr. Wasilchen's constitutional rights.  (Def. Mot. at 11-

16  12.)  The court agrees.  "This circuit has recognized that parents have a Fourteenth

17  Amendment liberty interest in the companionship and society of their children."

18  *Wilkinson*, 610 F.3d at 554.  Under the Fourteenth Amendment, only official conduct that

19  "shocks the conscience" in depriving parents of their liberty interest is cognizable as a

20  due process violation.  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting

21  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  This is a more stringent

22

1  standard than the Fourth Amendment's reasonableness standard. *Moreland v. Las Vegas*

2  *Metro. Police Dep't*, 159 F.3d 365, 371 n.4 (9th Cir. 1998).

3       Because Mr. Gohrman did not violate Mr. Wasilchen's Fourth Amendment rights,

4  as discussed above, the court concludes that Mr. Gohrman's conduct does not "shock the

5  conscience," as required by the Fourteenth amendment. *See Alford v. Humboldt Cnty.*,

6  785 F. Supp. 2d 867, 880 (N.D. Cal. 2011) ("Because the Court earlier found that Deputy

7  Berry's conduct was within the bounds of the Fourth Amendment, his conduct also fails

8  to sustain a claim under the 'shocks the conscience' standard applicable to Fourteenth

9  Amendment claims."); *Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d

10  1170, 1191 (D. Nev. 2008) (finding that the defendants did not violate parents'

11  Fourteenth Amendment rights because defendants did not violate child's Fourth

12  Amendment rights).  The court thus grants summary judgment to Defendants on this

13  claim.

14       **2.  Plaintiffs' § 1983 Claim against the County**

15       Defendants also move for summary judgment on Plaintiffs' § 1983 claim against

16  the County.  (Def. Mot. at 9.)  In light of the court's conclusion above that Mr. Gohrman

17  did not commit any constitutional violation, there is no basis for the County's liability

18  under § 1983. *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir.

19  2006) (dismissing § 1983 claim against municipalities because there was no underlying

20  constitutional violation); *Jackson v. City of Bremerton*, 268 F.3d 646, 653-54 (9th Cir.

21  2001) ("Neither a municipality nor a supervisor, however, can be held liable under §

22

1   1983 where no injury or constitutional violation has occurred.")  The court, therefore,

2   grants summary judgment to Defendants on this claim.

3       **3.  Plaintiffs' Negligence Claim**

4       Defendants seek summary judgment on Plaintiffs' negligence claim.  (Def. Mot. at

5   15-17.)  Among other things, Defendants argue that Plaintiffs cannot establish duty,

6   breach, or causation.  (*Id.*)  Plaintiffs assert that there are at least questions of fact

7   regarding Defendants' liability for negligence.  (Resp. to Def. Mot. at 22-24.)  For the

8   reasons set forth below, the court finds that Plaintiffs have failed to raise a triable issue of

9   fact with respect to their negligence claim.

10       "In order to establish actionable negligence, a plaintiff must establish:  (1) the

11   existence of a duty owed to the complaining party; (2) a breach of the duty; (3) resulting

12   injury; and (4) that the breach was the proximate cause of the injury."  *Folsom v. Burger*

13   *King*, 958 P.2d 301, 308 (Wash. 1998); *see also Stalter v. State*, 86 P.3d 1159, 1162

14   (Wash. 2004).  Because "a negligence action will not lie if a defendant owed a plaintiff

15   no duty of care, the primary question is whether a duty of care existed."  *Folson*, 958

16   P.2d at 308.  "The existence of a duty is a question of law."  *Id.*

17       In Washington, the public duty doctrine provides that "recovery from a municipal

18   corporation in tort is possible only where plaintiff shows that the duty breached was owed

19   to an individual, and was not the breach of a general obligation owed to the public in

20   general, i.e., a duty owed to all is a duty owed to none."  *Beal v. City of Seattle*, 954 P.2d

21   237, 244 (Wash. 1998).  Accordingly, plaintiffs must fall within one of the established

22   exceptions to the public duty doctrine in order to demonstrate that they were owed a duty

1   of care by a governmental entity.  *Cummins v. Lewis Cnty.*, 133 P.3d 458, 461-62 (Wash.

2   2006).  There are four common law "exceptions" to the public duty doctrine: legislative

3   intent, failure to enforce, rescue doctrine, and special relationship.  *Id.* at 462 n.7.

4          Plaintiffs contend that the legislative intent exception applies here.  (Resp. to Def.

5   Mot. at 23.)  The Washington State Supreme Court has explained that the legislative

6   intent exception applies "when the terms of a legislative enactment evidence an intent to

7   identify and protect a particular and circumscribed class of persons."  *Bailey v. Town of*

8   *Forks*, 737 P.2d 1257, 1260 (Wash. 1987).  Plaintiffs rely on the Noxious Weed Statute,

9   which states in relevant part:  "[C]ivil liability for negligence shall lie in any case in

10  which entry and any of the activities connected therewith are not undertaken with

11  reasonable care."  RCW 17.10.160(c); *see also* RCW 17.10.134 ("Obligations or

12  liabilities incurred by any county or regional noxious weed control board or any claims

13  against a county or regional noxious weed control board are governed by chapter 4.96

14  RCW or RCW 4.08.120 . . . .").  Based on the language in RCW 17.10.160, the court

15  finds that the Washington Legislature enacted that provision to protect individuals who

16  come into contact with County employees from negligence where the County employee

17  is entering property for the purpose of administering the Noxious Weed Statute or

18  performing any activities connected with such an entry.  Accordingly, the court

19  determines, as a matter of law, that Mr. Gohrman had a duty to exercise reasonable care

20  under these circumstances.

21         Next, the court must consider whether there is evidence upon which a reasonable

22  jury could find that Mr. Gohrman breached his duty of care to Mr. Wasilchen and that

ORDER- 40

1  this breach proximately caused Mr. Wasilchen's death.  Defendants argue that Mr.

2  Gohrman's duty was defined by the Noxious Weed Statute and there is no evidence that

3  he violated those duties.  (Def. Mot. at 17.)  Plaintiffs respond that Mr. Gohrman

4  breached his duties under the Noxious Weed Statute by:  (1) instigating the conflict and

5  ignoring Mr. Wasilchen's pleas to leave his property; (2) misrepresenting the facts and

6  the law to Deputies Rasar and King; (3) failing to secure a warrant; and (4) ignoring the

7  County policy to deescalate conflict and driving back onto Mr. Wasilchen's property.

8  (Resp. to Def. Mot. at 23-24.)  The court will address below each of Plaintiffs'

9  arguments, crediting their version of the facts, as it must on summary judgment.

10      First, even if a reasonable jury could conclude that Mr. Gohrman breached his

11  duty of care by instigating the initial confrontation with Mr. Wasilchen and ignoring Mr.

12  Wasilchen's requests to leave the area in front of his house, neither of these actions

13  proximately caused Mr. Wasilchen's death.  Once Mr. Wasilchen physically removed

14  Mr. Gohrman from the area in front of his home, Mr. Gohrman retreated to the weed

15  control vehicle and left to call 9-1-1.  The court concludes that these facts cannot sustain

16  Plaintiffs' negligence claim.

17      Second, the court finds that any alleged misrepresentation of fact or law made by

18  Mr. Gohrman to Deputies Rasar and King does not support Plaintiffs' negligence claim.

19  Plaintiffs argue that Mr. Gohrman misrepresented the facts related to the initial

20  confrontation, wrongly stated that he had a right to go onto Mr. Wasilchen's property,

21  and incorrectly claimed that Mr. Wasilchen had committed a misdemeanor under the

22  Noxious Weed Statute.  (Resp. to Def. Mot. at 13.)  Even believing Plaintiffs' version of

1   the facts, however, Mr. Wasilchen's intentional and unwanted touching of Mr. Gohrman

2   constitutes an assault.  *See State v. Tyler*, 155 P.3d 1002, 1006 (Wash. Ct. App. 2007)

3   ("Assault is an intentional touching or striking of another person that is harmful or

4   offensive, regardless of whether it results in physical injury.").  Mr. Gohrman's call to 9-

5   1-1, therefore, was reasonable under the circumstances.  Furthermore, Deputies Rasar and

6   King were justified, based on the reported assault alone, in deciding to return to Mr.

7   Wasilchen's residence to investigate further.  Any other alleged misrepresentation by Mr.

8   Gohrman, therefore, is immaterial to the subsequent course of events.  For example,

9   although Deputy Rasar testified that he would have liked to have known about the

10  Noxious Weed Statute's warrant requirement, he did not indicate that this information

11  would have changed his decision to return to Mr. Wasilchen's residence.  (*See* 1st Dearie

12  Decl. Ex. R (Dkt. # 25-3) (Rasar Dep.) at 78-79.)

13          Third, the court finds that a reasonable jury could not conclude that Mr. Gohrman

14  breached his duty by failing to secure a warrant before returning to Mr. Wasilchen's

15  residence.  As discussed above with respect to Plaintiffs' motion for summary judgment,

16  Mr. Gohrman did not need to secure a warrant pursuant to the Fourth Amendment

17  because he did not conduct a search of any constitutionally protected property.

18  Moreover, the Noxious Weed Statute does not require a warrant under the facts of this

19  case.  The relevant statutory provision states:

20          When there is probable cause to believe that there is property within this
            state not otherwise exempt from process or execution upon which noxious
21          weeds are standing or growing and the owner refuses permission to inspect
            the property, a judge of the superior court or district court in the county in
22          which the property is located may, upon the request of the county noxious

1  weed control board or its agent, issue a warrant directed to the board or
   agent authorizing the taking of specimens of weeds or other materials,
2  general inspection, and the performance of eradication or control work.

3  RCW 17.10.160(1).

4         The undisputed evidence here establishes that Mr. Gohrman was not attempting to

5  inspect Mr. Wasilchen's property on May 29, 2009.  His original goal was to simply

6  speak with Mr. Wasilchen regarding future noxious weed control and obtain either his

7  promise to control the weeds on his property or to sign the hold harmless agreement.

8  When he returned with the deputies, he did not do so to take specimens of weeds or other

9  materials, generally inspect Mr. Wasilchen's property, or perform eradication or control

10 work.  As such, a warrant pursuant to the Noxious Weed Statute would not have been

11 applicable.  *See* RCW 17.10.160(1).  He returned, rather, at the request of Deputy Rasar

12 in order to lead the deputies to Mr. Wasilchen's residence so that they could question him

13 about the altercation and, if permitted by Mr. Wasilchen, discuss noxious weed control.

14 Moreover, it is undisputed that Mr. Gohrman remained on County-owned property at all

15 times.  Based on these facts, the court finds that Mr. Gohrman did not breach a duty

16 under the Noxious Weed Statute by failing to obtain a warrant before returning to Mr.

17 Wasilchen's residence.

18        Finally, Mr. Gohrman did not breach any County policy to deescalate conflict.  He

19 retreated after his initial altercation and called 9-1-1, which was reasonable under the

20 circumstances and did not violate any County policy.  He only returned to Mr.

21 Wasilchen's residence at the request of Deputy Rasar (1st Gohrman Decl. ¶ 25;

22 MacFarlane Decl. ¶ 17; 1st Rasar Decl. ¶ 14; King Decl. ¶ 10), and there is no evidence

1   in the record that complying with law enforcement violates County policy either.  In fact,

2   a purpose of the deputies' visit to Mr. Wasilchen was to deescalate the conflict.  (1st

3   Rasar Decl. ¶¶ 14-15; King Decl. ¶ 10.)  Accordingly, these facts do not support

4   Plaintiffs' negligence claim.

5         In sum, Plaintiffs have failed to establish a genuine issue of material fact as to

6   their negligence claim, and Defendants are entitled to summary judgment.

7        **4.  Plaintiffs' Noxious Weed Statute Claim**

8         Next, the court considers Defendants' motion for summary judgment on Plaintiffs'

9   claim that Mr. Gohrman violated the Noxious Weed Statute.  (Def. Mot. at 17.)

10   Defendants contend that there is no evidence that Mr. Gohrman violated the statute.  (*Id.*)

11   Plaintiffs maintain, however, that he violated the statute by failing to obtain a warrant as

12   required by RCW 17.10.160, and failed to follow the written notice requirements set forth

13   in RCW 17.10.170.  (Resp. to Def. Mot. at 16, 22.)  With respect to written notice, the

14   Noxious Weed Statute states in relevant part:  "Whenever the county noxious weed

15   control board finds that noxious weeds are present on any parcel of land, and that the

16   owner is not taking prompt and sufficient action to control the noxious weeds . . . , it shall

17   notify the owner that a violation of this chapter exists."  RCW 17.10.170(1).  This notice

18   must be in writing and sent via certified mail.  *Id.*

19         As discussed above, Mr. Gohrman did not violate the Noxious Weed Statute by

20   returning to Mr. Wasilchen's residence without a warrant.  Moreover, Mr. Gohrman was

21   not required to contact Mr. Wasilchen via certified mail under RCW 17.10.170 because

22   there is no indication that Mr. Wasilchen was "not taking prompt and sufficient action to

1   control the noxious weeds." *See* RCW 17.10.170(1). The undisputed evidence shows

2   that knotweed control work occurs in late summer and early fall, not in May when the

3   events giving rise to this lawsuit occurred. Mr. Gohrman merely contacted Mr.

4   Wasilchen on May 29, 2009, to talk about future control work. As such, RCW 17.10.170

5   is not implicated. For these reasons, the court grants Defendants' motion and dismisses

6   Plaintiffs' claim under the Noxious Weed Statute.

7       **5. Plaintiffs' Wrongful Death Claim**

8       Finally, Defendants move for summary judgment on Plaintiffs' wrongful death

9   claim. (Def. Mot. at 21-22.) Under Washington State law, a decedent's personal

10  representative is authorized to maintain an action for damages when the decedent's death

11  "is caused by the wrongful act, neglect, or default of another." RCW 4.20.010. A

12  wrongful death action, however, must be for the benefit of the decedent's spouse,

13  registered domestic partner, child, or children. RCW 4.20.020. When the decedent has

14  no spouse, domestic partner, or children, a wrongful death action may be maintained "for

15  the benefit of the parents, sisters, or brothers, who may be dependent on the deceased

16  person for support . . . ." RCW 4.20.020.

17      Here, there is no dispute that Mr. Wasilchen had no spouse, domestic partner, or

18  children. Therefore, the issue is whether Ms. Vukasin or Ms. Tubbs were dependent on

19  Mr. Wasilchen for support within the meaning of the wrongful death statute. The statute

20  does not define the words "dependent" and "support," however the Washington State

21  Supreme Court recently reviewed and expounded upon those terms in *Armantrout v.*

22

ORDER- 45

1    *Carlson*, 214 P.3d 914 (Wash. 2009).  The Court explained that it first interpreted the

2    meaning of dependency as follows:

3          [W]e would not give [the statute] such a strict construction as to say it
           means wholly dependent, or that the parent must have no means of support
4          or livelihood other than the deceased, such a construction being too harsh
           and not in accordance with the humane purpose of the act.  Nevertheless,
5          there must be some degree of dependency, some substantial dependency, a
           necessitous want on the part of the parent, and a recognition of that
6          necessity on the part of the child.

7    *Id.* at 916-17 (quoting *Bortle v. N. Pac. Ry. Co.*, 111 P. 788, 789 (Wash. 1910))

8    (alterations in *Armantrout*).  Since the *Bortle* opinion, the Court has further defined

9    "substantial dependency" as "a term having relation to the circumstances of the plaintiff."

10   *Armantrout*, 214 P.3d at 917 (quoting *Mitchell v. Rice*, 48 P.2d 949, 951 (1935)).

11   Moreover, "[t]he dependency must be based on the situation existing at the time of [the]

12   decedent's death and not on promises of future contributions."  *Id.*; *see also Grant v.*

13   *Libby, McNeil & Libby*, 258 P. 842, 844 (Wash. 1927) ("[T]here must be a substantial

14   dependency upon the part of the parent for support at the time of the death of the child.").

15        "Under these guidelines, courts have generally allowed claims by beneficiaries

16   who can demonstrate they had a need for the decedent's regular contributions of

17   support."  *Armantrout*, 214 P.3d at 917.  By contrast, "[c]ourts have generally disallowed

18   claims where the claimant cannot 'identify evidence suggesting that they needed or were

19   dependent upon [decedent's] services.'"  *Id.* (quoting *Masunaga v. Gapasin*, 790 P.2d

20   171, 174 (Wash. Ct. App. 1990)).  Additionally, Washington courts have "long held that

21   dependence means *financial* dependence."  *Masunaga*, 790 P.2d at 173 (emphasis in

22   original); *see also Armantrout*, 214 P.3d at 917.  In *Armantrout*, the Court further held

1  that triers of fact may "consider services that have a monetary value when assessing a

2  claimant's dependency on the decedent for support." *Id.* at 919.

3        Defendants maintain that there is no evidence that either Ms. Vukasin or Ms.

4  Tubbs was financially dependent on Mr. Wasilchen.  (Def. Mot. at 22.)  In fact,

5  Defendants argue, Mr. Wasilchen relied on Ms. Vukasin for financial assistance.  (*Id.*

6  (citing Held Decl. Ex. C (Vukasin Dep.) at 44-49).)  Defendants cite the deposition

7  testimony of Ms. Vukasin, in which she stated that she used to lend Mr. Wasilchen

8  money to help with payments on his car loan or mortgage.  (Held Decl. Ex. C (Vukasin

9  Dep.) at 45-46 ("I know I helped him around the end.").)  Evidence that Mr. Wasilchen

10  was financially dependent on Ms. Vukasin satisfies Defendants' initial burden on

11  summary judgment, thus Plaintiffs' must establish a genuine issue of material fact to

12  preclude summary judgment on their wrongful death claim.

13        In response, Plaintiffs do not contest that Ms. Tubbs was not financially dependent

14  on Mr. Wasilchen, but they maintain that there is at least a question of fact regarding Ms.

15  Vukasin's dependence.  (Resp. to Def. Mot. at 24.)  Plaintiffs point to Ms. Vukasin's

16  testimony that she depended on Mr. Wasilchen for help around her house, including

17  pressure washing her house and cleaning debris off the roof, and that more than four

18  years before his death, Mr. Wasilchen installed a new kitchen floor in Ms. Vukasin's

19  house and helped her twice when her basement flooded.  (2d Dearie Decl. Ex. 8 (Dkt. #

20  36-1) (Vukasin Dep.) at 46-57.)  Ms. Tubbs also testified that Mr. Wasilchen helped Ms.

21  Vukasin around her house and with her car, but Ms. Tubbs could not remember the

22

1   timeframe in which these activities occurred.  (2d Dearie Decl. Ex. 9 (Dkt. # 36-2)

2   (Tubbs Dep.) at 39-40.)

3          Viewing the evidence in Plaintiffs' favor, the court concludes that they have

4   submitted insufficient evidence to create a material question of fact regarding whether

5   Ms. Vukasin or Ms. Tubbs was substantially financially dependent on Mr. Wasilchen at

6   the time of his death.  The court recognizes that Ms. Vukasin clearly benefited from Mr.

7   Wasilchen's support and assistance, yet Washington case law does not support the

8   proposition that mere benefit is enough to create the dependency contemplated by the

9   wrongful death statute.  *See Bortle*, 111 P. at 789 (characterizing occasional financial

10  support as "nothing more than such gifts as countless sons occasionally bestow upon their

11  parents, with no thought of dependency, nor that it is a gift of necessity").  In this case,

12  there is no evidence of a "necessitous want on the part of" Ms. Vukasin for the financial

13  benefit derived from Mr. Wasilchen's services.  *Id.*  The only evidence in the record

14  regarding Ms. Vukasin's financial situation in the year or two before Mr. Wasilchen's

15  death shows that she had sufficient means to provide financial support to Mr. Wasilchen.

16  (Held Decl. Ex. C. (Vukasin Dep.) at 45-46.)  Without further evidence of Ms. Vukasin's

17  need for financial assistance, there is insufficient evidence upon which a reasonable jury

18  could find that she was substantially financially dependent on Mr. Wasilchen.

19  Accordingly, the court grants summary judgment to Defendants on Plaintiffs' wrongful

20  death claim.

21  \\

22  \\

1

## IV.    CONCLUSION

2          For the foregoing reasons, the court DENIES Plaintiffs' motion for partial

3   summary judgment (Dkt. # 24), and GRANTS Defendants' motion for summary

4   judgment (Dkt. # 14).

5          Dated this 25th day of April, 2012.

6

7

8          _____

9          JAMES L. ROBART
           United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 49